IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DETERSOL, S.A. de C.V.,

    Plaintiff,

    v.

BENSO CORPORATION, et al.,

    Defendants.

CIVIL NO.: 11-1341 (MEL)

**OPINION AND ORDER**

**I.    PROCEDURAL POSTURE**

On April 14, 2011, plaintiff Detersol, S.A. de C.V. ("Detersol" or "plaintiff") filed a verified complaint against defendants Benso Corporation d/b/a General Candy Imports ("Benso"), Universal Products, Inc. ("Universal"), Benso's president Benjamín Negrón, his spouse and the conjugal partnership they form (together, "defendants"). (Docket No. 1.) Claiming, *inter alia*, that defendants violated a non-exclusive sales and distribution agreement between Detersol and Benso by continually failing to pay its due invoices, plaintiff asserts causes of action for breach of contract, collection of monies, damages pursuant to Article 1802 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141, and declaratory judgment. Id. An amended verified complaint (the "amended complaint") identifying Negrón's spouse as Somarie Quijano Borges ("Quijano-Borges") was filed on July 20, 2011.[1] (Docket No. 40.) Defendant Benso filed an answer and counterclaim on August 14, 2011,

---

[1] Plaintiff has since clarified that the collection of monies and breach of contract claims are brought only as to defendants Benso and Universal (as Benso's alleged successor-in-interest), and that the Article 1802 claim is brought only as to Negrón. (Docket No. 104, pp. 4-13.) Further, since the amended complaint does not contain any specific allegations regarding Benso's wife, Quijano-Borges, the court shall treat any claim against her as being derivative of plaintiff's claim against Negrón. (Docket No. 40.)

and the other defendants filed their answer and counterclaim on September 7, 2011. (Docket No. 72; 102.) Plaintiff filed its answer to Benso's counterclaim on August 30, 2011. (Docket No. 94.)

On April 20, 2011, plaintiff filed a motion requesting provisional remedies pursuant to Fed. R. Civ. P. ("Rule") 64. (Docket No. 5.) Specifically, plaintiff seeks pre-judgment attachment of defendants' property and a "garnishment order against any third parties in possession of defendants' monies, assets, and/or interest" in order to satisfy any future judgment in plaintiff's favor. Id. This motion was initially granted as unopposed. (Docket No. 21.) The order, however, was subsequently vacated, and the matter was referred to the undersigned for the holding of a hearing to consider plaintiff's request.[2] (Docket No. 34.)

An evidentiary hearing was held on August 18, 2011 at which Negrón testified on behalf of defendants, and Oscar Castillo Vega ("Castillo-Vega"), the general manager of Detersol, testified on behalf of plaintiff. (Docket Nos. 85; 103.) Both parties have since submitted post-hearing memoranda. (Docket Nos. 97; 104.)

## II.   FACTUAL BACKGROUND

Detersol is a Mexican company that manufactures and exports a variety of food products, including pasta sauces, juices and snacks. (Docket No. 40, ¶ 7.) In or around 2003, Detersol entered into an oral agreement with Benso for the latter to distribute Detersol's products in Puerto Rico.[3] (Docket Nos. 40, ¶ 11; 103, pp. 105:23-106:1.) The payment terms of this distribution agreement

---

[2] Pursuant to the parties' implicit consent, the case was subsequently transferred to the undersigned for all further proceedings, including the entry of judgment. (Docket Nos. 55; 56.)

[3] While the amended complaint states that the parties' relationship began in 2008 (Docket No. 40, ¶ 11), Castillo testified that this was an error. (Docket No. 103, pp. 67:18-69:9.) Indeed, at the hearing the parties stipulated that their relationship began in 2003. (Docket No. 103, p. 105:6-14.)

are in dispute.[4]  At the evidentiary hearing, Castillo-Vega testified that he negotiated with Negrón that payment would be due 30 days from the date Detersol's products were delivered to Puerto Rico, which he indicated was the same payment term Detersol employed with other clients. (Docket No. 103, pp. 10:24-11:6.)  By contrast, Negrón testified that the parties had negotiated either a 60- or 90-day payment term from the date of delivery. (Docket No. 103, p. 119:1-3.)

      The parties agree that Benso's usual practice was to send Detersol post-dated checks that Castillo-Vega would deposit after receiving authorization from Negrón.[5]  (Docket No. 103, pp. 11:21-23, 13:21-14:14, 117:12-24.)  Castillo-Vega testified that in 2008, Benso's unpaid invoices started to "accumulate", both because Negrón placed stop payment orders on checks he sent to Detersol and because other checks "bounced" due to insufficient funds. (Docket No. 103, p. 11:18-24.)  Castillo-Vega indicated that, in all, he was unable to collect payment from Benso on approximately 20 to 25 occasions, and that this issue persisted until approximately July 2010. (Docket No. 103, p. 12:5-6.)  He explained that in an effort to reach an agreement regarding Benso's debt, he sent Negrón a letter on November 1, 2010 requesting that Benso provide "a concrete and specific proposal for full repayment" of the debt within a one-year period. (Docket No. 96-3; 103, p. 25:5-11.)  The letter further stated that any proposed payment plan by Benso was required to be collateralized, and that Detersol would only provide future orders to Benso that were paid in full. (Docket No. 96-3.)  In response, Castillo-Vega testified that Negrón proposed that Detersol send Benso merchandise on a 120-day credit term and that, in return, Benso would make "minimal" payments toward the outstanding balance. (Docket No. 103, p. 28:5-12.)  On December 27, 2010,

---

[4] The parties also dispute whether the agreement granted Benso the exclusive right to distribute Detersol's products in Puerto Rico. (Docket Nos. 40, ¶ 11; 103, pp. 105:23-106:1.)

[5] The parties agree that while this was Benso's predominant method of payment, the distributor did use wire transfers on several occasions. (Docket No. 103, pp. 84:8-11, 119:16-17.)

Castillo-Vega sent a follow-up letter indicating that since Benso had failed to submit an acceptable repayment proposal, Detersol was providing them a final period in which to do so, after which Detersol would resort to collection efforts. (Docket No. 96-4.) However, Castillo-Vega testified that Negrón responded only with a proposal similar to the one Detersol had recently rejected. (Docket No. 103, p. 30:12-18.)

Castillo-Vega stated that after trying to meet with Negrón on numerous occasions to discuss Benso's debt, Castillo-Vega traveled to Puerto Rico in January 2011, where he waited for Negrón at Benso's offices. (Docket No. 103, pp. 31:13-32:16.) During their ensuing meeting, Castillo-Vega stated that Negrón proposed that Detersol open a line of credit with Universal, another company owned by Negrón, and that Negrón, in fact, showed him a web site for Universal referencing Detersol products. (Docket No. 103, pp. 32:17-33:13, 33:25-34:4.) Castillo-Vega testified that he rejected this proposal as well. (Docket No. 103, p. 33:14-15.)

At some point thereafter, Detersol terminated its relationship with Benso due to Benso's lack of payment, although the exact date on which this occurred is unclear.[6] Castillo-Vega testified – and provided documentary evidence indicating – that as of January 2011, Benso's outstanding debt to Detersol totaled $407,942.84. (Docket No. 103, pp. 35:5-37:22.) Negrón, however, maintains that any debt incurred by Benso has since been paid in full. (Docket No. 103, p. 126, p. 1-8.)

---

[6]Castillo-Vega testified that Detersol terminated its relationship with Benso in late 2010, and that – at present – Detersol sells no merchandise in Puerto Rico. (Docket No. 103, pp. 38:15-19,76:15-21.) Negrón stated at the hearing that Detersol terminated its relationship with Benso following their meeting in January 2011. (Docket No. 103, p. 124:8-17.) In addition, defendants submitted into evidence three purchase orders from Benso to Detersol, all dated March 16, 2011, although it is unclear whether said orders were ever filled. (Docket Nos. 95-3; 103, pp. 115:3-116:5.)

### III.   LEGAL ANALYSIS

#### A.   Standard for Motion for Provisional Remedies

Provisional remedies permit a plaintiff to secure a judgment that could be entered in due time.  Buscaglia v. Vasarely, 2010 U.S. Dist. LEXIS 68618, at *7 (D.P.R. July 8, 2010) (citing Garcia v. The Commonwealth Ins. Co., 18 P.R. Offic. Trans. 454 (1987)).  Rule 64 of the Federal Rules of Civil Procedure dictates that such remedies are only available under the circumstances and in the manner provided by the law of the state in which the federal court is located.  Rule 56 of the Puerto Rico Code of Civil Procedure provides that a plaintiff, in any action, may move – before or after judgment is entered – for provisional attachment of a defendant's property to "secure satisfaction of the judgment."  Buscaglia, 2010 U.S. Dist. LEXIS 68618, at *7-*8 (citing 32 L.P.R.A. App. III R. 56).  Rule 56 allows the court ample discretion in deciding whether to issue an order for provisional remedies.  Vera-Veléz v. Díaz-Sánchez, 2009 U.S. Dist. LEXIS 81392 (D.P.R. Sept. 8, 2009).  For instance, Rule 56.1 states that "the court may issue any provisional order it may deem necessary" and "shall consider the interests of all the parties and shall adjudicate as substantial justice may require."  32 L.P.R.A. App. III R. 56.

"The validity of a such an attachment depends on the validity of the plaintiff's claim against the defendant-attachee."  Buscaglia, 2010 U.S. Dist. LEXIS 68618, at *7-*8.  Thus, to secure such a remedy, a plaintiff must demonstrate its probability of prevailing on the merits.  Id.  In addition, the party much show that the provisional remedy is "reasonable and adequate ... to guarantee the effectiveness of the judgment which in due time may be rendered."  HMG Property v. Parque Industrial Río Canas, Inc., 847 F.2d 908, 914 (1st Cir. 1998) (citation omitted).

## B.      Plaintiff's Claims Against Benso

Plaintiff asserts claims for the collection of monies and for breach of contract against defendant Benso. (Docket No. 104, pp. 4-10.) As the analysis below demonstrates that plaintiff is likely to succeed on its collections claim, Benso's ability to satisfy any judgment entered into in this case shall also be addressed. See HMG Property, 847 F.2d at 914.

Collections of Monies

In the amended complaint, plaintiff seeks $478,914.92 in unpaid invoices from Benso. (Docket No. 40, ¶ 27.) Defendants denies plaintiff's claim; in fact, Negrón testified at the hearing that Benso currently owes no debt to Detersol.[7] (Docket Nos. 97, pp. 10-13; 103, p. 126, p. 1-8.)

In support of its claim, plaintiff has submitted a debt certification – signed by Negrón – indicating that Benso was $379,617.36 in arrears as of January 15, 2010. (Docket No. 96-2; 103, pp. 126:9-127:4.) Furthermore, in Castillo-Vega's November and December 2010 letters to Negrón requesting that Benso address its unpaid invoices, Castillo-Vega stated that the total owed by Benso had reached $395,060.62. (Docket Nos. 96-3; 96-4.) Additionally, plaintiff has submitted a statement of accounts compiled by Detersol indicating that – as of January 31, 2011 – Benso owed Detersol $407,942.84. (Docket No. 96-5; 103, p. 35:5-37:22.) The totality of this evidence, coupled with the absence of any documentary evidence to support Negrón's claim that Benso's debt has been paid in full – strongly suggests that, at the time this suit was filed, Benso owed Detersol a substantial sum for its purchase of the latter's products for distribution in Puerto Rico.

---

[7] Negrón's credibility as a witness is questionable. For instance, on cross examination, Negrón testified that defendant Universal does not have any shareholders or a president, and he denied owning the corporation. (Docket No. 103, pp. 128:6-129:12.) However, Universal's 2010 annual report, which was submitted into evidence by defendants' attorneys, lists Negrón as the president, treasurer, authorized person, and resident agent for the corporation. (Docket No. 95-2.) Moreover, Negrón did not provide a plausible justification for his failure to acknowledge his multiple roles in Universal. (Docket No. 103, p. 129:13-17.)

The exact amount of the outstanding debt, however, remains unclear. At the hearing, Castillo-Vega testified that he was unable to collect payment from Benso on approximately 20 to 25 occasions from 2008 to 2010 either because the checks bounced due to insufficient funds or because Negrón had placed a stop payment order on them. (Docket No. 103, p. 12:5-6.) While plaintiff has submitted to the court copies of a series of checks from Benso that Castillo-Vega was unable to cash for either reason – as well as evidence of charges incurred by Detersol in its attempt to do so – said exhibit has limited evidentiary value in determining Benso's total debt for two reasons. First, Castillo-Vega testified that Negrón later provided replacement checks in almost all cases that Detersol was able to cash and apply to other invoices.[8] (Docket No. 96-1; 103, pp. 78:3-79:25, 94:17-24.) Second, according to Castillo-Vega's own testimony, the exhibit gives an incomplete picture of Benso's debt, since it does not include 1) all checks that either bounced or were stopped by Negrón, 2) certain checks from Benso that Castillo-Vega never attempted to deposit, and 3) debts owed for invoices for which Negrón never submitted any payment. (Docket Nos. 96-1; 103, pp. 91:22-92:7, 93:7- 97:3.)

Based on the foregoing, it is likely that plaintiff will succeed on this claim, although further evidence would be required to determine the exact amount that Detersol is entitled to recover. However, as plaintiff has only set forth evidence supporting – at most – a finding that Benso is $407,942.84 in arrears, any provisional remedy imposed on account of this claim shall be limited to said amount.

---

[8] Castillo-Vega testified that the one exception was a set of four checks that were not included in the exhibit, of which he attempted to deposit only two. (Docket No. 103, p. 96:3.)

Breach of Distribution Agreement

Plaintiff also brings a breach of contract claim against Benso, arguing that the distributor's repeated failure to pay past-due invoices violated the parties' agreement. (Docket No. 104, pp. 7-10.) Benso maintains that while it kept a balance with Detersol that "reached or surpassed $300,000", it was part of the parties' course of dealings for Benso to operate on credit, and thus that any delay in payment did not constitute a breach of their agreement. (Docket No. 97, pp. 12-15.)

Puerto Rico's Law 75 governs the business relationship between principals and the locally appointed distributors that market their products. See Freightliner LLC v. P.R. Truck Sales, Inc., 399 F. Supp. 2d 57, 70 (D.P.R. 2005). Under the statute, payment for goods on time is usually considered an essential obligation of a dealer's contract. See Tatan Mgmt. v. Jacfran Corp., 270 F. Supp. 2d 197, 201-02 (D.P.R. 2003). As such, a failure to do so usually constitutes "just cause" to terminate the agreement. Id. While parties may later alter the conditions and terms of this obligation "explicitly or through their conduct, ... such changes do not strip the obligation to pay of its status as an 'essential obligation[.]'" Id. (citation omitted).

In this case, the distribution agreement between Detersol and Benso was never memorialized. Not surprisingly, Castillo-Vega and Negrón gave very different accounts of the agreement's payment terms. Castillo-Vega testified that the parties agreed that payment would be due 30 days from the date Detersol's products were delivered to Puerto Rico. (Docket No. 103, pp. 10:24-11:6.) Plaintiff argues that any variation from the original payment terms was simply a good faith effort by Detersol to continue its relationship with Benso after the latter's debt continued to grow, so as not to "lose the Puerto Rico market." (Docket No. 104, p. 8.) See Tatan Mgmt., 270 F. Supp.2d at 203 (court found fact that defendants "tolerated due balances and attempted to resolve the dispute amicably

8

through reasonable plans" not to constitute an alteration of the distribution agreement's payment terms).

Negrón, on the other hand, stated that the parties had negotiated either a 60- or 90-day payment term from the date of delivery. (Docket No. 103, pp. 119:1-3.) Negrón testified that invoices were paid on a "one-for-one" basis, meaning that Benso would pay old invoices off when they purchased new shipments. (Docket No. 103, p. 137:7-12.) Furthermore, Negrón indicated that Detersol extended credit to Benso from the very beginning of their relationship, and that the credit limit had grown to $250,000 to $300,000 within several years. (Docket No. 103, p. 118:21-25.) This was in part due to the fact that Benso was making significant purchases of Detersol products; for instance, Negrón stated that Benso purchased approximately $700,000 to $800,000 in merchandise from Detersol in 2008.[9] (Docket No. 103, p. p. 119:4-7.) Benso argues that Detersol's tacit acceptance of this arrangement – at least prior to late 2010 when it sent two letters requesting a change in the parties' arrangement – was demonstrated by Detersol's willingness to continue shipping products to Benso throughout this period. (Docket No. 97, p. 13.)

In light of the above, the weight of the evidence does not strongly favor one party over the other regarding this claim. Therefore, as plaintiff has not demonstrated that its breach of contract claim is likely to succeed on the merits, said cause of action cannot serve as the basis for the imposition of provisional remedies against Benso.

<u>Benso's Ability to Satisfy a Judgment</u>

Having determined that plaintiff's collections claim is likely to succeed on the merits, the court must assess Benso's capacity to pay any judgment entered against it. On cross examination,

---

[9] By contrast, Castillo-Vega estimated Detersol's average annual sales in Puerto Rico during the course of the parties' relationship as between $350,00 and $400,000. (Docket No. 103, p. 39:7-10.)

9

Negrón testified that Benso is currently being restructured, and that it lacks adequate liquid assets to satisfy a judgment in this suit. (Docket No. 103, pp. 127:5-16, 130:24-25.) Negrón also stated that Benso does not have any current employees, and that it lacks the funds to hire a workforce, purchase necessary equipment, or to lease any warehousing space for inventory. (Docket No. 103, pp. 131:1-132:1, 132:3-7.) Consequently, Benso is not currently selling or distributing products on behalf of any companies in Puerto Rico. (Docket No. 103, p. 132:8-11.) In view of the above, the court finds that Benso lacks sufficient resources to satisfy a judgment, thus warranting the imposition of provisional remedies against Benso in this case.[10]

### C. Plaintiff's Claims Against Universal

Plaintiff also brings claims for the collection of monies and for breach of contract against Universal. (Docket Nos. 40; 104, pp. 10-12.) Detersol argues that Universal is liable for the debts incurred by Benso because it is Benso's successor-in-interest and because Universal currently "promotes, markets and offers" Detersol products through its web site. (Docket No. 104, p. 11.) Plaintiff points to Negrón's testimony that he formed Universal, that he proposed to Castillo-Ortiz that Detersol continue to do business with him through Universal as an "alternative" to Benso, as well as the fact that Negrón sent two purchase order to Castillo-Vega on Universal letterhead in December 2010. (Docket Nos. 96-6; 97, p. 15; 103, pp. 32:17-21, 33:25-34:2, 40:23-44:18.) Defendants maintain that Universal is not Benso's successor-in-interest, citing the fact that the company has never operated since its inception, as well as Castillo-Vega's testimony that the purchase orders in question were never filled. (Docket No. 97, p. 15.; 103, p. 88:7-9.)

---

[10] While plaintiff requests that the court take judicial notice of three recently settled cases in this district involving Benso (two of which were consolidated), neither party has provided the court with any indication of the consideration paid by Benso – if any – in reaching said settlements. See Civil Nos. 10-1449 (SEC), 10-1451 (SEC), 10-1994 (JAF). Therefore, Benso's involvement in these cases shall have limited evidentiary value in determining its ability to pay any judgment entered in this case.

Negrón formed Universal in 2001, thinking that the company could serve to "diversify the credit portfolio" available for each of his clients. (Docket No. 103, p. 107:1-3, 107:18-22.) However, this idea never materialized, and to date Universal has never operated. (Docket No. 103, pp. 107:4-5, 107:22-108:3.) Regarding the purchase orders, Negrón testified that he had discussed the concept of using Universal as an alternative to Benso as a possible solution to Benso's credit problems; however, Negrón testified that he ultimately determined that such a plan was not "feasible" at that time. (Docket No. 103, p. 115:3-22.) To wit, Negrón stated that he later cancelled these purchase orders and re-ordered the products through Benso. (Docket No. 103, p. 115:3-22.) Defendants contend that the exploratory nature of Universal's purchase orders is further evidenced by the fact that Universal had no assets – and could thus not complete any purchase – as well as Negrón's inclusion of a note on the purchase order stating "do not produce until the shipping date is sent" (certified translation). (Docket Nos. 96-6; 97, p. 15.)

As for plaintiff's claims regarding Universal's marketing of Detersol products, Castillo-Vega testified that photographs of Detersol products were included on Universal's web site. (Docket No. 103, p. 40: 13-14.) While Negrón indicated that the site in question was a "dummy" web site – and thus not intended for public viewing – plaintiff has submitted a notarial record indicating that the web site was, in fact, accessible by the public. (Pl. Ex. 7.)

Based on the foregoing, although the evidence suggests that Negrón was contemplating using Universal as a successor-in-interest to Benso, there is not sufficient evidence to support a finding that this option ever proceeded beyond the plenary stage. Critically, there no evidence that Detersol, as Benso's contractual partner in the distribution agreement, ever did – or would – accept such a relationship. In light of this, it is unlikely that plaintiff's claims against Universal would succeed

11

on the merits. Consequently, plaintiff's request for provisional remedies against defendant Universal is hereby DENIED.

### D. Plaintiff's Claims Against Negrón

Finally, plaintiff brings claims against Negrón under Article 1802 based on violations of Articles 229 and 230 of the Puerto Rico Penal Code, 33 P.R. Laws Ann. §§ 4857-58. (Docket No. 40, ¶¶ 35-38.) As an initial matter, while the Supreme Court of Puerto Rico has held that civil liability may be based upon a breach of a criminal statute under certain circumstances, plaintiff has not provided relevant case law demonstrating that this principle should apply to the present case. See Bussati v. Grace & Compania, Puerto Rico, 274 F. Supp. 601, 603 (D.P.R. 1967) (citation omitted). However, even assuming, *arguendo*, that it does, plaintiff has failed to demonstrate its likelihood of success on the merits of this claim, as it has not provided sufficient evidence to establish that Negrón satisfied all of the elements of the underlying criminal statutes.

> Pursuant to 33 P.R. Laws Ann. § 4857:
>
> Any person who, with the intent to defraud writes, issues, endorses or releases a check, money order, draft or note for the payment of money chargeable to any bank or other depository knowing that the issuer or drafter thereof lacks sufficient funds in said bank or depositary for the full payment of the check, money order, draft or note at the time of presenting same, nor has the express authorization to overdraw, shall incur a misdemeanor.

Id. Under 33 P.R. Laws Ann. § 4858:

> Any person who, with the intent to defraud, orders any bank or depository to cancel an account designated for the making of payments with money charged against such account knowing that prior to said cancellation he/she had written, issued, endorsed or delivered any checks, money orders, drafts or notes to be charged against said cancelled account; or who draws against a closed or non-existent account; or stops the payment of the instrument after its issue without justified cause shall incur a misdemeanor. If the amount represented by the instrument is more than five hundred dollars ($500), the offender shall incur a fourth degree felony.

Id.

While the parties agree that – at least "on occasion" – checks sent by Negrón could not be cashed either because they bounced or because Negrón had placed a stop payment order on them (Docket No. 103, pp. 11:18-24, 149:3-16), there is insufficient evidence on record showing that Negrón acted with an "intent to defraud." To wit, Castillo-Vega testified that Negrón provided substitute checks for those that bounced or were otherwise unable to be cashed, and that there were "no problem[s]" with the replacement checks.[11] (Docket No. 103, p. 78:3-79:3.) While Castillo-Vega goes on to state that the replacement checks did not fully cure Benso's debt, Negrón's mitigating actions nevertheless suggest that Benso was not attempting to defraud Detersol. See Wadsworth, Inc. v. Schwarz-Nin, 951 F. Supp. 314, 326 (D.P.R. 1996) (court found that the substitution of bounced checks constituted sufficient evidence to "dispel any implication of [corporation's] intent to defraud," and noted that corporation's inability to repay its debts – by itself – did not imply an intent to defraud). In light of the parties' payment method, which involved Negrón sending groups of post-dated checks to Castillo-Vega which the latter would cash after receiving specific instructions to do so, coupled with the lack of additional evidence illustrating Negrón's intent to defraud Detersol through the use of such checks, plaintiff's request for provisional remedies as to defendant Negrón is DENIED.[12]

---

[11] As discussed in more detail above, it is unclear whether all checks were substituted.

[12] The court also notes that the record lacks evidence as to Negrón's ability to satisfy any judgment entered into this case, an important consideration in a determination of provisional remedies. See HMG Property, 847 F.2d at 914. In fact, the only reference to Negrón's personal finances in the record suggests that Negrón would be able to satisfy a judgment in this case, as Castillo-Vega testified that during his meeting with Negrón in January 2011, Negrón mentioned that he "had a lot of properties" and showed Castillo-Vega a list of them. (Docket No. 103, p. 97:22-24.) Further, while the court takes judicial notice that a suit for $7.3 million brought by Banco Popular is currently pending against Negrón and several corporations in the Court of First Instance, San Juan Part, this court cannot speak to the merits of that case, and any attempt to estimate Negrón's potential liability from such a suit would call for speculation.

## IV.     CONCLUSION

Based on the foregoing, it is hereby ordered that plaintiff's request for provisional remedies be GRANTED as to defendant Benso and DENIED as to defendants Universal, Negrón, Quijano Borges, and the Negrón-Quijano conjugal partnership.

Therefore, it is ORDERED that the personal or real property, assets, and other credits of Defendant Benso, of value not exceeding $407,942.84, be attached, garnished, or seized to secure the satisfaction of the judgment, whether the personal property be in its possession, or in the possession of third parties, upon which the instant order is served.  It is FURTHER ORDERED that Benso be prohibited from tampering, encumbering in any form or manner any personal or real property in favor of third parties.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 19th day of September, 2011.

s/Marcos E. López<br>
U.S. Magistrate Judge